

FILED

DEC - 8 2016

CLERK, US DISTRICT COURT
NORFOLK, VA

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>and<br>COMMONWEALTH OF VIRGINIA, *ex. rel.*<br>DR. MATTHEW SACHS<br>and<br>LAURIE DIERSTEIN, | Civil Action No. 2:16CV 705 |
| Plaintiffs/Relators, | **FILED IN CAMERA AND UNDER SEAL**<br>**31 U.S.C. §§3729-32** |
| v. | |
| UNIVERSAL HEALTH SERVICES, INC.,<br>and<br>KEMPSVILLE CENTER FOR BEHAVIORAL HEALTH,<br>Defendants. | JURY TRIAL DEMANDED |

## FALSE CLAIMS ACT COMPLAINT
### "QUI TAM"

This action is brought by two *qui tam* Relators, Dr. Matthew Sachs and Laurie Dierstein, in the name of the United States Government and the Commonwealth of Virginia, to recover penalties and damages arising from the submission of false Medicaid, Medicare, and Tricare claims by Defendants, Universal Health Services, Inc., and Kempsville Center for Behavioral Health. Relators Sachs and Dierstein are "original sources" of the information on which the allegations contained herein are based, as that term is defined in 31 U.S.C. §3730(e)(4). The Relators also bring this action in their own right to obtain the relief needed to make them whole from the damages they suffered as a result of their wrongful discharge in violation of whistleblower protection provision of the Virginia Taxpayers Against Fraud Act, and Virginia common law cause of action for constructive discharge in violation of public policy.

1

## JURISDICTION AND VENUE

1.      This action arises under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S. C. § 1331 in that this action arises under the laws of the United States.  This Court has subject matter jurisdiction over the Virginia Taxpayers Against Fraud ("VTAF") claims, and relators' wrongful discharge claims, pursuant to 31. U.S.C. § 3732(b).

2.      The FCA requires that the complaint be **filed under seal for a minimum of 60 days (without service on the defendant during that time)** to allow the Government time to conduct its own investigation and to determine whether to join the suit.

3.      The FCA allows any person having information about a false or fraudulent claim for payment submitted to the Government to bring an action for himself and the Government, and to share in any recovery.

4.      This action is not based upon any public disclosure of any allegation or transaction described herein.  The Relators are the original source of the information upon which the allegations in this complain are based.  The Relators have direct and independent knowledge of the information upon which the False Claims Act allegations are based, and have voluntarily provided such information.

5.      As required by 31 U.S.C. 3730(b)(2), the Relators have served the United States Attorney General with copies of the complaint, and written disclosures of all material evidence related to the allegation in the complaint.

6.      Venue is proper in the United States District Court for the Eastern District of Virginia pursuant to 28 U.S. C. §§ 1391(b), and 1391(c), and under 31 U.S.C. 3732(a) because each Defendant transacts business within the district, and the acts proscribed by the False Claims Act occurred within the district.

## THE PARTIES

7.      Relator Dr. Matthew Sachs is a citizen and resident of the United States and Virginia and resides in Virginia Beach, Virginia.

8.      Relator Laurie Dierstein is a citizen and resident of the United States and Virginia and resides in Virginia Beach, Virginia.

9.      Universal Health Services, Inc., ("UHS") is a for-profit corporation doing business in Virginia, with a principal place of business located at 367 South Gulph Road, King of Prussia, Pennsylvania, 19406.

10.     UHS owns and operates for-profit hospitals and health care facilities throughout Virginia and the United States.

11.     UHS is Fortune 500 Corporation with approximately $9.0 billion in annual revenue that produced net income of more than $581 million in 2015.

12.     UHS is the largest facility-based behavioral health provider in the country, with its subsidiaries operating 216 behavioral health facilities in 37 states, Washington, DC, Puerto Rico, the U.S. Virgin Islands and the United Kingdom.

13.     UHS Behavior Health Division ("BHD") net revenue has increased each of the last five years and generated over $4 billion in net revenue in 2015 compare to only 2.2 billion in 2011.

3

14.      Kempsville Center for Behavioral Health ("Kempsville") is a Virginia Limited Liability company located at 860 Kempsville Road, Norfolk, Virginia 23502.

15.      In Virginia UHS owns and operates 10 behavioral Health Facilities, including The Kempsville Center for Behavioral Health (Kempsville) in Norfolk, Virginia.

16.      Unless otherwise denoted, UHS and Kempsville shall be referred to collectively as the "Defendants."

## FACTUAL ALLEGATIONS

17.      On or around November 2010, Defendant UHS purchased and took over operations of several facilities formerly known as The Pines, including Kempsville, Harbor Point Behavioral Health Center, 301 Fort Lane, Portsmouth, VA 23704, and The Pines Residential Treatment Center, 825 Crawford Pkwy, Portsmouth VA 23704-2301.

18.      Kempsville provides acute psychiatric inpatient hospitalization and psychiatric residential care to children and adolescents exhibiting behavioral and/or mental health concerns, as well as Partial Hospitalization day programs.

19.      The acute inpatient hospitalization program was licensed to accept both males and females ages 4-21 and the residential program accepts male and female adolescents ages 11-17.

20.      Kempsville is licensed by The Virginia Department of Behavioral Health and Developmental Services.

21.     School services are provided to both the inpatient and residential programs. The school is accredited by the Virginia Association of Independent Specialized Education Facilities (VAISEF).

22.     MEDICAID is a public assistance program providing for payment of medical expenses for low-income patients. Funding for Medicaid is shared between the Federal Government and state governments, including the Commonwealth of Virginia.

23.     In 2015, UHS received MEDICAID payments in excess of $90 million annually for services rendered in Virginia.

24.     TRICARE, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by Uniformed Services beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. 10 U.S.C §§1071-1110.

25.     TRICARE is an agency and instrumentality of the United States and its activities, operations, and contract are paid with federal funds.  10 U.S.C. §1071 *et seq*.

26.     TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by Defendants.

27.     Federal Employees Health Benefits (FEHB) Program is a federally funded medical benefits program that provides health insurance coverage for federal employees, retirees, and their dependents. 5 U.S.C. §§8901-8914.

28.     FEHB, also known as the Federal Employees Program, provides health insurance to enrolled beneficiaries through a collection of individual health care plans, including but not limited to Blue Cross and Blue Shield Association, Government Employees

5

Hospital Association, and Rural Carrier Benefits Plan. FEHB plans are managed by Office of Personnel Management.

29. Relator Dr. Sachs earned his medical degree at Virginia Commonwealth University School of Medicine in 2006. He received his Master of Public Health degree in occupational and environmental medicine at the Harvard School of Public Health in 2007. Dr. Sachs completed his residency and his dual fellowships in adult psychiatry and child and adolescent psychiatry at the University of Virginia in 2010 and 2012, respectively. He earned his Master in Business Administration from the University of Massachusetts-Amherst in July 2016.

30. From February 2013, through February 2015, Dr. Sachs worked as a staff psychiatrist at Kempsville and was responsible for evaluating, diagnosing, and admitting patients for acute inpatient hospitalization and residential treatment, treating them while at the facility, and approving their discharge.

31. Relator Laurie Dierstein is a licensed clinical social worker (LCSW). She earned a Bachelor of Science in psychology and statistics from Virginia Tech in 2004. She received a Master of Social Work from Boston University in 2006, and she completed internships with Tewksbury State Hospital and Suffolk County Juvenile Court Clinic.

32. From October, 2010, through September, 2015, Dierstein was employed by Kempsville as the Director of Admissions and was responsible for the clinical and administrative operations and the employees in the admissions department.

33. Defendants employed Matt Ours as the Chief Executive Officer at Kempsville from October, 2011, through July, 2015.

6

34.     Upon information and belief, prior to 2011, Ours was the CEO of UHS's Oak Plains Academy, a psychiatric residential treatment facility for children and adolescents ages 5-17, in Ashland City, Tennessee.

35.     Ours is currently the CEO of UHS's Rivendell Behavioral Health Hospital in Bowling Green, Kentucky.

36.     Jaime Fernandez was the Director of Nursing at Kempsville under Ours and took over as CEO at Kempsville when Ours departed.

37.     While at Kempsville, Ours put pressure on the doctors and admissions staff to fill the beds at the facility and to admit children to Acute Inpatient Care and the Residential Treatment Center even when he knew the admission staff and treating psychiatrist had determined that the patient did not need this level of care, determined that it would be detrimental to the patient, determined that the patient created a safety risk to other children admitted to the facilities, or that the facility could not provide the appropriate care to the patient.

38.     Ours also pressured and encouraged the treating psychiatrist to keep patients admitted to Kempsville for as long as the patients' third party payor would authorize, even when the doctors determined that inpatient care or residential treatment was no longer medically necessary or beneficial to the patient.

39.     Ours particularly encouraged unnecessary admissions and excessive length of stay (LOS) for patients covered by TRICARE or MEDICAID because these Government third party payors were more likely than private third party payors to approve admissions and extended lengths of stay and were less likely to question the need for the treatment.

40.     Often the first question asked by doctors when contacted by admission staff about a possible admission was the patient's insurance provider.

41.     Patients with Tricare and Medicaid were often admitted to acute inpatient care as soon as the doctor learned that the patient had TRICARE or MEDICAID coverage, without evaluation by doctors to determine the need for inpatient care.

42.     Ours required doctors and admissions staff to attend frequent meetings to discuss patient admissions and length of stay statistics for each doctor at the facility.

43.     At these meetings, the admissions and length of stay statistics for each doctor at Kempsville were prominently displayed and broken down by the patient's third party payor.

44.     The data at these meetings also included the total number of what UHS referred to as "underutilized" or "unutilized" days attributed to each doctor for the relevant time period.  Underutilized days are days authorized for acute inpatient admission by the patient's third party payor in excess of the number of days the doctor ultimately determines it is medically necessary to keep the patient admitted.  For example, if TRICARE authorized ten days of acute inpatient care based upon the doctor's initial report, but the doctor then determines after five days that the patient should be discharged and does in fact discharge the patient, this would result in five "underutilized" days.

45.     Ours would question, criticize, and ridicule doctors about underutilized days and patients that they did not admit to the facility, particularly if they had TRICARE or MEDICAID as their third party payor.

46.     Ours would tell the doctors that they were costing UHS money by not utilizing all the days authorized by the third party payor, without regard to the medical necessity, or even the harmful effects that unnecessary inpatient care might have on the patient.

47.     Ours explained to Dr. Sachs that he was under tremendous pressure from Gary M. Gilberti, the UHS Behavioral Health's Division Vice President, to improve length of stay averages because UHS made the most profit after the first five days a patient was admitted.

48.     On Fridays, Ours had a weekly phone conference with Gary Gilberti.   Ours required Relator Dierstein to prepare reports for these meetings detailing patient admissions, denials and length of stay by doctor and payor.

49.     Gary Gilberti told Ours that UHS wants length of stay to average between 7-10 days because upfront costs of admission (medical labs, psychological testing etc.) made longer stays much more profitable.

50.     Following these phone conferences with Gilberti, Ours would often call Dierstein into his office and verbally denigrate her, and he would threaten to place her on a Performance Improvement Plan (PIP) if she did not improve the admissions numbers.

51.     Once when Ours criticized Dr. Sachs for having a shorter average length of stay, Ours took out a calculator and told Dr. Sachs, "Let me teach you some CEO math." He then explained that when length of stay averages drop, even a little, it adds up to a substantial amount of money.   Ours showed Dr. Sachs on the calculator that when average LOS dropped even 0.3 of a day for one physician, over the course of one month with fifty admitted patients, it would result in $12,000 lost revenue.

9

52.     On another occasion, Ours demonstrated his "CEO math" by explaining that when Dr. Sachs had 16 "un-utilized" days over a period, he cost UHS $12,800 in lost revenue.

53.     Ours knew, and Dr. Sachs explained to him, that the only way to increase LOS and to avoid unutilized days would be to keep patients longer than was medically necessary or desirable and make false statements to MEDICAID, TRICARE and other insurance carriers to justify the continued treatment.

54.     When Dr. Sachs protested the pressure to extend patient LOS, Ours told Sachs that the pressure he put on the doctors and staff was nothing compared to the pressure he gets from "Corporate."

55.     Doctors at Kempsville knew that Ours and the admission staff wanted them to admit as many TRICARE and MEDICAID patients as possible because they were the easiest third party payors to get approval for acute inpatient care payments.

56.     Admissions would target patients for acute inpatient care as a first step to admitting them to long term Residential Treatment Center ("RTC"), as the easiest way to get a patient approved for RTC from a third party payors was a "bed-to-bed transfer" from acute inpatient care to RTC.

57.     Admission staff were often the only UHS employee to meet with the patient prior to admission to acute inpatient care, although only doctors had admission authority at Kempsville.

58.     Admission staff would then contact a physician, typically by telephone, to get admission to acute inpatient care approved.

59.     Ours would often come into the admissions office to get updates on the number of patients admitted and denied throughout the day and would phone in for updates at night.

60.     Ours was constantly putting pressure on admission staff to fill Kempsville with patients.  Ours demanded admission staff get "heads in beds" even though the decision to admit should have been made on the basis of patients' condition and the necessity for treatment.

61.     Ours instructed the admission staff at Kempsville, including Relator Laurie Dierstein, to "present each" patient to the reviewing doctor as a patient that should be admitted to inpatient care.

62.     Ours further instructed staff to "build a case" and "advocate" in favor of admission of every patient.

63.     Ours directed admission staff to exaggerate symptoms, behaviors and concerns in order to convince doctors to authorize admissions.

64.     Ours directed admission staff to omit other details, such as the fact that days had passed since the most severe behavior or symptom, in order to make it appear that acute inpatient care was appropriate to deal with an ongoing emergency.

65.     When doctors determined that admission to the facility was not medically necessary or not in the patient's best interest, the staff was instructed to question the doctor's decision and argue that the patient should be admitted.

66.     On many of these occasions, while the admission staff was trying to convince a physician to admit a patient, Ours would literally whisper into the ear of the admissions

employee telling them what to tell the physician, even though Ours had no clinical training or personal knowledge of the patient.

67.     If the doctor still refused to admit the patient, staff were instructed to contact a second on-call doctor and try to convince that doctor to admit the patient.

68.     Several employees of Kempsville's Admissions Department trained in these methods were promoted to positions as the Director of Admissions at other UHS facilities.

69.     Nadya Lieb worked in the admission department at Kempsville with Relator Dierstein and is the current Director of Admissions at UHS's Harbor Point Behavioral Health Center located at 301 Fort Lane, Portsmouth, VA 23704.

70.     Chylanda Williams worked in the admission department at Kempsville with Relator Dierstein and is currently the Director of Admissions at UHS's Newport News Behavioral Health Center located at 17579 Warwick Blvd., Newport News, VA 23603.

71.     If the on-call doctor refused to admit, the staff was instructed by Ours to contact Kempsville's Medical Director, Dr. Lenard Lexier, and try to convince him to admit the patient.

72.     Dr. Lenard Lexier and his wife, Dr. Wendy Lexier, were the easiest doctors to get MEDICAID and TRICARE patients approved for admission to acute inpatient care.

73.     Because Medicaid and Tricare approved inpatient admissions more easily, at the highest rates, and for the longest length of stays, Defendants pressured doctors to increase the admission number of these patients.

74.     In order to admit patients to the acute inpatient care facility, doctors would provide false diagnosis(es) intended to justify the medical necessity of inpatient care in order to get the third party payor to approve and pay for the treatment.

75.     On occasion, if a patient's parent or guardian would not consent to admission of the patient, and despite the lack of medical necessity for admission, the staff at Kempsville would threaten to call the police and the Virginia Department of Child Protective Services (CPS) to force the parents to admit their child to acute inpatient care. This policy was dictated from CEO Ours and DON Fernandez to the Admissions Department Director Laurie Dierstein, who then instructed her staff to follow said policy.

### Count I: Federal False Claims Act

76.     The False Claims Act liability attaches to any person who knowingly presents or causes a false or fraudulent claim to be presented for payment, or causes a false record or statement to be made to get a false or fraudulent claim paid by the government.  31 U.S.C. §3729(a)(1)&(2).

77.     Under the False Claims Act, "knowing" and "knowingly" mean that a person, with respect to information:

    a)  has actual knowledge of the information;

    b)  acts in deliberate ignorance of the truth or falsity of the information; or

    c)  acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.  31 U.S.C. §3729(b).

78.     The False Claims Act is violated not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who

engages in a course of conduct that causes the government to pay a false or fraudulent claim for money.

79.     The False Claims Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $10,000 for each such claim, plus three times the amount of the damages sustained by the Government.

### A. Acute Inpatient Psychiatric Care.

80.     Beginning in at least 2010, and continuing through the present, Defendants engaged in various activities and techniques to improperly and fraudulently admit children to acute inpatient care in order to receive payments from MEDICAID and TRICARE for emergency inpatient care that was not medically necessary or appropriate.

81.     The purpose of such acute inpatient care is to stabilize a life-threatening or severely disabling condition within the context of a brief, intensive model of inpatient care in order to permit management of the patient's condition at a less intensive level of care.

82.     Such care is appropriate only if the patient requires services of an intensity and nature that are generally recognized as being effectively and safely provided only in an acute inpatient hospital setting.

83.     Acute inpatient care shall not be considered necessary unless the patient needs to be observed and assessed on a 24-hour basis by skilled nursing staff, and/or requires continued intervention by a multidisciplinary treatment team; and in addition, at least one of the following criteria is determined to be met: (A) Patient poses a serious risk of harm

14

to self and/or others, (B) Patient is in need of high dosage, intensive medication or somatic and/or psychological treatment, with potentially serious side effects, (C) Patient has acute disturbances of mood, behavior, or thinking. 32 CFR 199.4(b)(6)(i).

84.     In order for an admission to qualify as an emergency, the following criteria, in addition to those in paragraph (b)(6)(i) of 32 CFR 199.4, must be met: (A) The patient must be at immediate risk of serious harm to self and or others based on a psychiatric evaluation performed by a physician (or other qualified mental health professional with hospital admission authority); and; (B) The patient requires immediate continuous skilled observation and treatment at the acute psychiatric level of care. 32 CFR 1994(b)(6)(ii)

85.     Many patients admitted for emergency acute inpatient mental health services at Kempsville did not satisfy the criteria required by 32 CFR 199.4(b)(6)(i-ii) and, in fact, did not require acute inpatient mental health services.

86.     Admitting physicians were pressured by Ours to give patients with conduct disorders (treatable best on an outpatient basis), false, exaggerated, and vague diagnoses that were potentially severe enough for payors to approve acute inpatient care.

87.     Conduct disorders such as parent-child relational problems, learning problems, mental retardation, oppositional defiant disorder, attention deficit disorder, autism spectrum disorders including Asperger's disorder, and substance abuse issues are not valid and admittable inpatient psychiatric primary diagnoses by any health care provider, as these are considered diagnoses most appropriately treated in the outpatient setting.

88.     To get around this, admission staff and doctors were pressured to diagnose the primary problem as Mood Disorder NOS (Not Otherwise Specified), Bipolar Disorder, or

15

Major Depressive Disorder, as these primary diagnoses could be used to justify acute inpatient care. A diagnosis of Depressive Disorder, NOS, was sometimes used, but this diagnosis is not severe or specific enough to warrant inpatient treatment because it implies a vague and minor depression condition for which outpatient care is more appropriate. The actual primary diagnoses were then "buried" by listing them as "secondary diagnoses" so as to ensure reimbursement by health insurance providers, since the first-listed primary diagnosis is the one reimbursed and permitted to authorize inpatient care.

89.     Defendants billed MEDICAID and TRICARE a daily room and board fee for each patient in acute care and additional charges for counselling and medication.

90.     MEDICAID paid Kempsville $565.97 per patient, per day for acute inpatient room and board from July 1, 2013, through July 1, 2014 and $570.03 per patient, per day for room and board to UHS from July 1 2015 through July 1, 2016.

91.     TRICARE paid Kempsville approximately $665 per patient, per day for acute inpatient room and board.

92.     Pursuant to contracts with physicians working at Kempsville, doctors' fees for conducting rounds, admissions, and discharges was either retained by Kempsville, as in the case of Dr. Sachs, or retained by the doctors in addition to their salary.

93.     MEDICAID paid $154.96 per patient for the doctors' admission evaluation during 2013.

94.     TRICARE paid $191 per patient for the doctors' admission evaluation during 2013.

95.     MEDICAID paid $77 per patient for physician rounds during 2013, and $56 for each discharge summary.

96.     TRICARE paid $99 dollar per patient for physician rounds during 2013, and $102 for each discharge summary.

97.     The following are examples of patients admitted to acute inpatient care at Kempsville and knowingly billed to TRICARE or MEDICAID although Defendants knew that the bill submitted to the Virginia and the Federal Governments was false and fraudulent (because the patient did not require inpatient care, it would be detrimental to the patient, the patient created a safety risk to other children and staff at the facility, or that the facility could not provide the appropriate care to the patient) and false information was provided in order to get the admission and payment approved by TRICARE, MEDICAID, or other sources of government funds for the unnecessary medical services provided.

98.     These examples are typical of hundreds of similar false claims submitted by UHS at Kempsville and other facilities throughout the United States as part of a UHS scheme and practice to "fill beds" at its facilities and maximize profits, without regard for the medical necessity of the treatment.

99.     PATIENT A, an adolescent female, was admitted to Kempsville's acute inpatient care from July 12, 2013, through July 22, 2013, and falsely diagnosed with Mood Disorder Not Otherwise Specified (NOS), International Classification of Diseases-9-296.9 (hereinafter "ICD-9-Code").

100.     This claim was knowingly false and fraudulent as PATIENT A should have been diagnosed with Oppositional Defiant Disorder, ICD-9-313.81, or Parent-Child Relational Problem, V61.20. but did not have a psychiatric illness requiring acute inpatient treatment.

101.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care of PATIENT A and were paid by TRICARE for daily facility fees and additional professional services.

102.     PATIENT A was admitted again to Kempsville's acute inpatient care from August 18, 2013, through August 28, 2013, and falsely diagnosed with Mood Disorder NOS, ICD-9-296.9.

103.     This claim was knowingly false and fraudulent as PATIENT A should have been diagnosed with Oppositional Defiant Disorder, ICD-9-313.81, or Parent-Child Relational Problem, V61.20, but did not have a psychiatric illness requiring acute inpatient treatment.

104.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care of PATIENT A and were paid by TRICARE for daily facility fees and additional professional services.

105.     PATIENT A was admitted again to Kempsville's acute inpatient care from April 26, 2014, through May 5, 2014, and falsely diagnosed as Mood Disorder NOS, ICD-9-296.9.

106.     This claim was knowingly false and fraudulent as PATIENT A should have been diagnosed with Oppositional Defiant Disorder, ICD-9-313.81, or Parent-Child Relational

18

Problem, V61.20, but did not have a psychiatric illness requiring acute inpatient treatment.

107.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care of PATIENT A and were paid by TRICARE for daily facility fees and additional professional services.

108.     PATIENT A was admitted again to Kempsville's acute inpatient care from August 26, 2014, through August 31, 2014, and falsely diagnosed as Mood Disorder NOS, ICD-9-296.9.

109.     This claim was knowingly false and fraudulent as PATIENT A should have been diagnosed with Oppositional Defiant Disorder, ICD-9-313.81, or Parent-Child Relational Problem, V61.20, but did not have a psychiatric illness requiring acute inpatient treatment.

110.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care of PATIENT A and were paid by TRICARE for daily facility fees and additional professional services.

111.     PATIENT A was admitted again to Kempsville's acute inpatient care from September 2, 2014, through September 9, 2014, and falsely diagnosed with Mood Disorder NOS, ICD-9-296.9.

112.     This claim was knowingly false and fraudulent as PATIENT A should have been diagnosed with Oppositional Defiant Disorder, ICD-9-313.81, or Parent-Child Relational Problem, V61.20, but did not have a psychiatric illness requiring acute inpatient treatment.

113.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care of PATIENT A and were paid by TRICARE for daily facility fees and additional professional services.

114.     PATIENT B, an adolescent female with an IQ below 70, was admitted to Kempsville's acute inpatient care on four (4) separate occasions: June 6-June 13, 2013; September-September 15, 2013; and October 18-October 25, 2013. The third admission resulted in a residential treatment program admission which began October 25, 2013, ending June 6, 2014. The patient was admitted to the acute inpatient unit again for a fourth time from December 10-December 22, 2014.

115.     On each admission PATIENT B was falsely diagnosed with Bipolar Disorder, Mixed Type, Severe, Without Psychotic Features, ICD-9-296.64.

116.     In fact, PATIENT B should not have been admitted and was suffering from the effects of Borderline Intellectual Functioning, ICD-9-V62.89; Asperger's Disorder, ICD-9- 299.80; Attention Deficit Hyperactivity Disorder, Combined Type, ICD-9-314.01; Learning Disorder, Not Otherwise Specified, ICD-9-315.9; and/or Conduct Disorder, ICD-9-312.82.

117.     These claims were knowingly false and fraudulent as PATIENT B suffered from behavioral problems, but did not have a psychiatric illness requiring acute inpatient treatment.

118.     This claim was also fraudulent as PATIENT B should not have been admitted because her educational needs could not be met at Kempsville due to her low intelligence quotient and Asperger's disorder.

20

119.     PATIENT B was also chemically dependent and Kempsville did not have substance abuse counselors or appropriate medical monitoring for detoxification.

120.     Defendants submitted these false claims to MEDICAID for these days of acute inpatient care and were paid by MEDICAID daily facility fees and fees for additional professional services.

121.     PATIENT C, an adolescent male, was admitted from October 16, 2013, through October 23, 2013, to Kempsville's acute inpatient care and falsely diagnosed with Mood Disorder, NOS, ICD-9-296.90.

122.     In fact, PATIENT C should not have been admitted to acute inpatient care as he suffered from behavioral problems associated with Conduct Disorder, Adolescent Onset Type, ICD-9-312.82 and Parent-Child Relational Problem ICD-9- V61.20, but did not have a psychiatric illness requiring acute inpatient treatment.

123.     This claim was knowingly false and fraudulent as PATIENT C suffered from behavioral problems and psychiatric diagnoses but did not have a psychiatric illness requiring acute inpatient treatment.

124.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care and were paid by TRICARE daily facility charges and additional professional fees.

125.     PATIENT C was admitted again admitted from November 15, 2013, through November 25, 2013, to Kempsville's acute inpatient care and falsely diagnosed with Mood Disorder, NOS, ICD-9-296.90.

126.    In fact, PATIENT C should not have been admitted to acute inpatient care as he suffered from behavioral problems associated with Conduct Disorder, Adolescent Onset Type, ICD-9-312.82 and Parent-Child Relational Problem ICD-9- V61.20, but did not have a psychiatric illness requiring acute inpatient treatment.

127.    This claim was knowingly false and fraudulent as PATIENT C suffered from behavioral problems and psychiatric diagnoses but did not have a psychiatric illness requiring acute inpatient treatment.

128.    Defendants submitted this false claim to TRICARE for these days of acute inpatient care and were paid by TRICARE for daily facility charges and additional professional fees.

129.    PATIENT D, an adolescent male, was admitted from December 22, 2013, through January 9, 2014, to Kempsville's acute inpatient care and falsely diagnosed with Bipolar Disorder Mixed Type, Severe, Without Psychotic Features, ICD-9-296.64.

130.    In fact, PATIENT D should not have been admitted to acute inpatient care as he suffered from behavioral problems associated with Conduct Disorder, Adolescent Onset Type, ICD-9-312.82 and Parent-Child Relational Problem ICD-9- V61.20, but did not have a psychiatric illness requiring acute inpatient treatment.

131.    This claim was knowingly false and fraudulent as PATIENT D suffered from behavioral problems and psychiatric diagnoses but did not have a psychiatric illness requiring acute inpatient treatment.

132.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care and were paid by TRICARE for daily facility charges and additional professional fees.

133.     PATIENT E, an adolescent male, was admitted from December 20, 2013, through December 27, 2013, to Kempsville's acute inpatient care diagnosed with Major Depressive Disorder, Recurrent, Severe, Without Psychosis, ICD-9- 296.33.

134.     In fact, PATIENT E should not have been admitted to acute inpatient care as he suffered from Depressive Disorder, NOS, ICD-9-311.00; Stimulant Abuse, ICD-9-305.70; Conduct Disorder, Adolescent Type, ICD-9-312.82; Parent-Child Relational Problem, ICD-9-V61.20, not a psychiatric illness requiring acute inpatient care.

135.     This claim was knowingly false and fraudulent as PATIENT E did not have a psychiatric diagnosis requiring acute inpatient treatment.

136.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care and were paid by TRICARE for daily facility charges and additional professional fees.

137.     PATIENT E, was admitted again from January 10, 2014, through January 21, 2014, to Kempsville's acute inpatient mental health and diagnosed with Major Depressive Disorder, recurrent, severe, without psychosis, ICD-9- 296.33.

138.     PATIENT E was sent from inpatient care to RTC on January 24, 2014, on a bed-to-bed transfer and remained in RTC until July 3, 2014.

139.     In fact, PATIENT E should not have been admitted to acute inpatient care or RTC as he suffered from Depressive Disorder, NOS, ICD-9-311.00; Stimulant Abuse, ICD-9-

305.70; Conduct Disorder, Adolescent Type, ICD-9-312.82; Parent-Child Relational Problem, ICD-9-V61.20, but did not have a psychiatric illness requiring acute inpatient treatment.

140.    These claims were knowingly false and fraudulent as PATIENT E did not have a psychiatric illness requiring acute inpatient treatment or RTC.

141.    Defendants submitted this false claim to TRICARE for these days of acute inpatient care and RTC and were paid by TRICARE for daily facility charges and additional professional fees.

142.    PATIENT E, was admitted again to the acute inpatient unit at Kempsville on January 10, 2014 to January 21, 2014 and diagnosed with Major Depressive Disorder, Recurrent, Severe, Without Psychosis, ICD-9- 296.33.

143.    In fact, PATIENT E should not have been admitted as he suffered from Depressive Disorder, NOS, ICD-9-311.00; Stimulant Abuse, ICD-9-305.70; Conduct Disorder, Adolescent Type, ICD-9-312.82; Parent-Child Relational Problem, ICD-9-V61.20, not psychiatric illness requiring acute inpatient care.

144.    These claims were knowingly false and fraudulent as PATIENT E did not have a psychiatric illness requiring acute inpatient treatment.

145.    Defendants submitted these false claims to Blue Cross Blue Shield and Virginia Medicaid for these days of acute inpatient care and were paid by either insurer (BCBS until a denial of care was reached, then Medicaid paid for the remaining days) for daily facility charges and additional professional fees.

146.     PATIENT F, an adolescent male, was admitted four (4) times to Kempsville's acute inpatient care diagnosed with Mood Disorder NOS, ICD-9-296.90. The first time was from March 14, 2014, through March 22, 2014.

147.     In fact, PATIENT F should not have been admitted as he suffered from Asperger's Disorder, ICD-9-299.80, Oppositional Defiant Disorder, ICD-9- 313.81; ADHD, Combined Type, ICD-9- 314.01 and related behavior problems not requiring acute inpatient care.

148.     This claim was knowingly false and fraudulent as PATIENT F suffered from Autism related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient care.

149.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care and were paid by TRICARE for daily facility charges and additional professional fees.

150.     PATIENT F was admitted again from April 2, 2014, through April 12, 2014, to Kempsville's acute inpatient mental health patient diagnosed with Mood Disorder NOS, ICD-9-296.90.

151.     In fact, PATIENT F should not have been admitted as he suffered from Asperger's Disorder, ICD-9-299.80, Oppositional Defiant Disorder, ICD-9-313.81; ADHD, Combined Type, ICD-9-314.01 and related behavior problems not requiring acute inpatient care.

152.    This claim was knowingly false and fraudulent as PATIENT F suffered from Autism related behavioral problem but did not have a psychiatric diagnosis requiring acute inpatient care.

153.    Defendants submitted this false claim to TRICARE for these days of acute inpatient care and were paid by TRICARE for daily facility charges and additional professional fees.

154.    PATIENT F was admitted again from April 16, 2014, through April 28, 2014, to Kempsville's acute inpatient mental health patient diagnosed with Mood Disorder NOS, ICD-9-296.90.

155.    In fact, PATIENT F should not have been admitted as he suffered from Asperger's Disorder, ICD-9-299.80, Oppositional Defiant Disorder, ICD-9- 313.81; ADHD, Combined Type, ICD-9- 314.01 and related behavior problems not requiring acute inpatient care.

156.    This claim was knowingly false and fraudulent as PATIENT F suffered from Autism related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient care.

157.    Defendants submitted this false claim to TRICARE for these days of acute inpatient care and were paid by TRICARE for daily facility charges and additional professional fees.

158.    PATIENT F was admitted again from November 11, 2014, through November 26, 2014, to Kempsville's acute inpatient mental health patient diagnosed with Mood Disorder NOS, ICD-9-296.90.

159.     In fact, PATIENT F should not have been admitted as he suffered from Asperger's Disorder, ICD-9-299.80, Oppositional Defiant Disorder, ICD-9- 313.81; ADHD, Combined Type, ICD-9- 314.01 and related behavior problems not requiring acute inpatient care.

160.     This claim was knowingly false and fraudulent as PATIENT F suffered from Autism related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient care.

161.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care and were paid by TRICARE for daily facility charges and additional professional fees.

162.     PATIENT G, an adolescent male was admitted from August 20, 2014, through August 25, 2014, to Kempsville's acute inpatient care and falsely diagnosed with Major Depressive Disorder, Single Episode, Severe, Without Psychosis, ICD-9-296.23.

163.     In fact, PATIENT G should not have been admitted as he suffered from Asperger's Disorder, ICD-9-299.80, Depressive Disorder, NOS, ICD-9- 311.00 and related behavior problems, not a psychiatric illness requiring acute inpatient care.

164.     This claim was knowingly false and fraudulent as PATIENT G suffered from Autism related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient treatment.

165.     Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and were paid by MEDICAID for daily facility charges and additional professional fees.

166.     PATIENT H, an adolescent female, was admitted from March 14, 2014, through March 21, 2014, to Kempsville's acute inpatient care and falsely diagnosed with Major Depressive Disorder NOS, Recurrent Episode, Severe, Without Psychosis, ICD-9-296.33.

167.     In fact, PATIENT H should not have been admitted as she was suffering from Depressive Disorder, NOS ICD-9-311.00 and related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient treatment.

168.     This claim was knowingly false and fraudulent as PATIENT H suffered from Depressive Disorder and related problems but did not have a psychiatric diagnosis requiring acute inpatient treatment.

169.     Defendants submitted this false claim to TRICARE for these days of acute inpatient care and were paid by TRICARE for daily facility charges and additional professional fees.

170.     PATIENT H, was admitted again to Kempsville's acute inpatient care on March 28, through April 8, 2014, falsely diagnosed with Major Depressive Disorder, Recurrent Episode, Severe, Without Psychosis, ICD-9-296.33 or some similar illness.

171.     PATIENT H was subsequently transferred to residential care at Kempsville on April 8, 2014, until August 1, 2014.

172.     This claim was knowingly false and fraudulent as PATIENT H suffered from Depressive Disorder, NOS ICD-9-311.00 and related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient care or RTC.

173.    Defendants submitted this false claim to TRICARE for these days of acute inpatient care and were paid by TRICARE for daily facility charges and additional professional fees.

174.    PATIENT I, an adolescent male was admitted to Kempsville's acute inpatient care from November 20, 2013, through November 27, 2013, falsely diagnosed with Mood Disorder NOS, ICD-9-296.90.

175.    PATIENT I was admitted because Blue Cross Blue Shield's FEHB program would authorize admission with little difficulty, and there was pressure from Kempsville's CEO to admit all BCBS FEHB patients in order to maximize profits.

176.    This claim was knowingly false and fraudulent as PATIENT I suffered from Polysubstance Dependence, NOS ICD-9-304.80 but did not have a psychiatric diagnosis requiring acute inpatient care.

177.    This claim was also knowingly false and fraudulent because Kempsville did not have the chemical dependence counselors and was not otherwise equipped to care for substance abuse patients.

178.    Defendants submitted this false claim to FEHB for these days of acute inpatient care and were paid by FEHB for daily facility charges and additional professional fees.

179.    PATIENT I was again admitted to Kempsville's acute inpatient care from April 5, 2014, through April 9, 2014, falsely diagnosed with Mood Disorder NOS, ICD-9-296.90

180.    This claim was knowingly false and fraudulent as PATIENT I suffered from Polysubstance Dependence, NOS ICD-9-304.80 and related behavioral problems but did not have a psychiatric illness requiring acute inpatient treatment, and Kempsville did not

29

have the chemical dependence counselors and was not otherwise equipped to care for substance abuse patients.

181.     Defendants submitted this false claim to FEHB for these days of acute inpatient care and were paid by FEHB for daily facility charges and additional professional fees.

182.     PATIENT I was again admitted to Kempsville's acute inpatient care from October 9, 2014, through October 17, 2014, falsely diagnosed with Mood Disorder NOS, ICD-9-296.90.

183.     This claim was knowingly false and fraudulent as PATIENT I suffered from Polysubstance Dependence, NOS ICD-9-304.80 and related behavioral problems but did not have a psychiatric illness requiring acute inpatient treatment, and Kempsville did not have the chemical dependence counselors and was not otherwise equipped to care for substance abuse patients.

184.     Defendants submitted this false claim to FEHB for these days of acute inpatient care and were paid by FEHB for daily facility charges and additional professional fees.

185.     PATIENT J, an adolescent female, was admitted on September 13, 2014 until September 21, 2014, to Kempsville's acute inpatient care, falsely diagnosed with Depressive Disorder, NOS, ICD-9-296.90.

186.     This claim was knowingly false and fraudulent as PATIENT J suffered from Bulimia Nervosa, ICD-9-307.51, but did not have a psychiatric diagnosis requiring acute inpatient care, and Kempsville was not a licensed eating disorder treatment facility as they were not staffed and trained to handle this diagnosis.

187.    Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and were paid by MEDICAID for daily facility charges and additional professional fees.

188.    PATIENT K, an adolescent male was admitted on November 3, 2013, until November 10, 2013, to Kempsville's acute inpatient unit, diagnosed with Bipolar Disorder, Mixed, Severe, ICD-9-296.63.

189.    This claim was knowingly false and fraudulent as PATIENT K should not have been admitted as he suffered from Asperger's Disorder, ICD-9-299.80, Conduct Disorder, Adolescent Onset Type, ICD-9- 299.80; ADHD, Combined Type, ICD-9-314.01 and related behavior problems, but did not have a psychiatric diagnosis requiring acute inpatient care.

190.    Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and were paid by MEDICAID for daily facility charges and additional professional fees.

191.    PATIENT L, an adolescent male admitted to Kempsville's acute inpatient care from June 10, 2014, through June 19, 2014, and falsely diagnosed with Mood Disorder NOS, ICD-9-296.90.

192.    This claim was knowingly false and fraudulent as PATIENT L should not have been admitted as he was suffering from Conduct Disorder, Adolescent Onset, ICD-9-312.82 and related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient treatment.

193.     In fact, PATIENT L was a danger to other patients and staff, and Kempsville was not capable of properly handling him.

194.     Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and were paid by MEDICAID for daily facility charges and additional professional fees.

195.     PATIENT M, an adolescent male, was admitted from November 8, 2013, through November 22, 2013, to Kempsville's acute inpatient care and falsely diagnosed with Mood Disorder NOS, ICD-9-296.33.

196.     This claim was knowingly false and fraudulent as PATIENT M should not have been admitted as he was suffering from Conduct Disorder, Adolescent Onset, ICD-9-312.82 and related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient treatment.

197.     In fact, he was a danger to other patients and staff, and Kempsville was not capable of properly handling him.

198.     Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and were paid by MEDICAID per day facility charges and daily professional physician fees.

199.     PATIENT N, an adolescent male, was admitted from August 5, 2014, through August 21, 2014, to Kempsville's acute inpatient care and falsely diagnosed with Mood Disorder NOS, ICD-9-296.33.

200.     This claim was knowingly false and fraudulent as PATIENT N should not have been admitted as he was suffering from Conduct Disorder, Adolescent Onset, ICD-9-

32

312.82 and related behavioral problems, but he did not have a psychiatric diagnosis requiring acute inpatient treatment.

201.     In fact, he was a danger to other patients and staff, and Kempsville was not capable of properly handling him.

202.     Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and were paid by MEDICAID for daily facility charges and additional professional fees.

203.     PATIENT O, an adolescent male, was admitted from August 6, 2014, through August 13, 2014, to Kempsville's acute inpatient care and falsely diagnosed with Mood Disorder NOS, ICD-9-296.33.

204.     This claim was knowingly false and fraudulent as PATIENT O should not have been admitted as he was suffering from Conduct Disorder, Adolescent Onset, ICD-9-312.82 and related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient treatment.

205.     In fact, he was a danger to other patients and staff, and Kempsville was not capable of properly handling him.

206.     Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and were paid by MEDICAID for daily facility charges and additional professional fees.

207.     PATIENT P, an adolescent male, was admitted from July 2, 2013, through July 21, 2013, to Kempsville's acute inpatient care and falsely diagnosed with Mood Disorder NOS, ICD-9-296.33.

208.    This claim was knowingly false and fraudulent as PATIENT P should not have
been admitted as he was suffering from Conduct Disorder, Adolescent Onset, ICD-9-
312.82 and related behavioral problems but did not have a psychiatric diagnosis requiring
acute inpatient treatment.

209.    In fact, he was a danger to other patients and staff and Kempsville was not
capable of properly handling him.

210.    Defendants submitted this false claim to MEDICAID for these days of acute
inpatient care and were paid by MEDICAID for daily facility charges and additional
professional fees.

211.    PATIENT Q, an adolescent male, was admitted from June 28, 2014, through July
2, 2014; August 21 2013, through August 28, 2013; July 25, 2013 through August 2,
2013; and September 2, 2013 through September 12, 2013, to Kempsville's acute
inpatient care and falsely diagnosed with Mood Disorder NOS, ICD-9-296.33.

212.    This claim was knowingly false and fraudulent as PATIENT Q should not have
been admitted as he was suffering from Conduct Disorder, Adolescent Onset, ICD-9-
312.82 and related behavioral problems but did not have a psychiatric diagnosis requiring
acute inpatient treatment.

213.    In fact, he was a danger to other patients and staff, and Kempsville was not
capable of properly handling him.

214.    Defendants submitted these false claims to MEDICAID for these days of acute
inpatient care and were paid by MEDICAID for daily facility charges and additional
professional fees.

215.     PATIENT R, an adolescent male, was admitted from May 31, 2014 through June 9, 2014, to Kempsville's acute inpatient care and falsely diagnosed with Mood Disorder NOS, ICD-9-296.90.

216.     This claim was knowingly false and fraudulent as PATIENT R should not have been admitted as he was suffering from Autistic Disorder, ICD-9-299.00 and related behavioral problems, but he did not have a psychiatric diagnosis requiring acute inpatient treatment.

217.     Defendants submitted this false claim to FEHB for these days of acute inpatient care and were paid by FEHB for daily facility charges and additional professional fees.

218.     PATIENT S, an adolescent female, was admitted from August 24, 2014, through September 3, 2014, to Kempsville's acute inpatient care and diagnosed with Mood Disorder NOS, ICD-9-296.33.

219.     This claim was knowingly false and fraudulent as PATIENT S should not have been admitted as she was suffering from Conduct Disorder, Adolescent Onset, ICD-9-312.82 and related behavioral problems, but she did not have a psychiatric diagnosis requiring acute inpatient treatment.

220.     In fact, she was a danger to other patients and staff, and Kempsville was not capable of properly handling her.

221.     Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and were paid by MEDICAID for daily facility charges and additional professional fees.

222.    PATIENT T, an adolescent female, was admitted on July 7, 2011, to acute inpatient care at Kempsville until July 16, 2011, and she was diagnosed with Mood Disorder NOS, ICD-9-296.90.

223.    This claim was knowingly false and fraudulent as PATIENT T should not have been admitted as she was suffering from Autistic Disorder, ICD-9-299.00 and related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient treatment.

224.    Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and were paid by MEDICAID for daily facility charges and additional professional fees.

225.    PATIENT U, an adolescent female, was admitted to Kempsville's acute inpatient care from October 11, 2014 through October 16, 2014, and falsely diagnosed with Major Depressive Disorder, Single Episode, Severe, Without Psychosis, ICD-9-296.23.

226.    On October 16, 2014 she was sent to RTC on a bed to bed transfer and remained in RTC until June 16, 2015.

227.    These claims were knowingly false and fraudulent as PATIENT U should not have been admitted as she suffered from Depressive Disorder, ICD-9-299.00 and related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient treatment or RTC.

228.    Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and RTC and were paid by MEDICAID for daily facility charges and additional professional fees.

229.     PATIENT V, an adolescent male, was admitted on June 29, 2011, through July 7, 2011, to acute inpatient care and falsely diagnosed with Bipolar Disorder, Mixed, Moderate, ICD-9-296.63.

230.     This claim was knowingly false and fraudulent as PATIENT V should not have been admitted as he was suffering from Conduct Disorder, Adolescent Onset, ICD-9-312.82 and related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient treatment.

231.     In fact he was a danger to patients and staff, and Kempsville was not capable of properly handling him.

232.     Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and were paid by MEDICAID for daily facility charges and additional professional fees.

### B.   Residential Treatment Centers

233.     Residential Treatment Centers (RTCs) provide extended care for children and adolescents who have mental health disorders (other than substance abuse disorders) requiring treatment 24 hours a day, 7 days a week.

234.     RTC's services and supplies shall not be considered medically or psychologically necessary unless, at a minimum, *all* the following criteria are clinically determined in the evaluation to be fully met: (A) Patient has a diagnosable psychiatric disorder; (B) Patient exhibits patterns of disruptive behavior with evidence of disturbances in family functioning or social relationships and persistent psychological and/or emotional disturbances; (C) RTC's services involve active clinical treatment under an

37

individualized treatment plan that provides for: (*1*) Specific level of care, and measurable goals/objectives relevant to each of the problems identified; (*2*) Skilled interventions by qualified mental health professionals to assist the patient and/or family; (*3*) Time frames for achieving proposed outcomes; and (*4*) Evaluation of treatment progress to include timely reviews and updates as appropriate of the patient's treatment plan that reflects alterations in the treatment regimen, the measurable goals/objectives, and the level of care required for each of the patient's problems, and explanations of any failure to achieve the treatment goals/objectives.(D) Unless therapeutically contraindicated, the family and/or guardian must actively participate in the continuing care of the patient either through direct involvement at the facility or geographically distant family therapy. (In the latter case, the treatment center must document that there has been collaboration with the family and/or guardian in all reviews.) 32 CFR 199.4(b)(4)(vii).

235.    Patients are often admitted to RTC for six months at a time, making these admissions are much more profitable than acute inpatient care.

236.    Many patients fraudulently admitted to acute inpatient care were targeted to be transferred to long term Residential Treatment Center ("RTC") as the easiest way to get a patient approved for RTC was a "bed-to-bed transfer" from acute inpatient care to RTC.

237.    Almost all Kempsville RTC patients came directly from acute inpatient care program.

238.    PATIENT B, an adolescent female, was admitted for acute inpatient care at Kempsville from October 18, 2013, through October 25, 2013, and then admitted to the Defendant's RTC, on a bed-to-bed transfer from acute inpatient care where she remained

until June 6, 2014, and falsely diagnosed with Bipolar Disorder, Mixed Type, Severe, Without Psychotic Features, ICD-9-296.64.

239.    In fact, PATIENT B should not have been admitted and was suffering from the effects of Borderline Intellectual Functioning, ICD-9-V62.89; Asperger's Disorder, ICD-9- 299.80; Attention Deficit Hyperactivity Disorder, Combined Type, ICD-9-314.01; Learning Disorder, Not Otherwise Specified, ICD-9-315.9; and/or Conduct Disorder, ICD-9-312.82.

240.    These claims were knowingly false and fraudulent as PATIENT B suffered from behavioral problems, but did not have a psychiatric illness requiring acute inpatient treatment or RTC inpatient treatment.

241.    This claim was also fraudulent and PATIENT B should not have been admitted because her educational needs could not be met at Kempsville due to her low intelligence quotient and Asperger's disorder.

242.    PATIENT B was also chemically dependent and Kempsville did not have substance abuse counselors or appropriate medical monitoring for detoxification.

243.    Defendants submitted these false claims to MEDICAID for these days of acute inpatient care and RTC inpatient care, and were paid by MEDICAID daily facility fees and fees for additional professional services.

244.    PATIENT E, an adolescent male, was admitted for acute inpatient care at Kempsville from January 10, 2014, through January 21, 2014, and from January 21, 2014, through July 3, 2014, to the Defendant's RTC, on a bed-to-bed transfer from acute

inpatient care, and diagnosed with Major Depressive Disorder, Recurrent, Severe, Without Psychosis, ICD-9- 296.33.

245.    In fact, PATIENT E should not have been admitted to Kempsville's acute inpatient care and should not have been admitted to RTC as he suffered from Depressive Disorder, NOS, ICD-9-311.00; Stimulant Abuse, ICD-9-305.70; Conduct Disorder, Adolescent Type, ICD-9-312.82; Parent-Child Relational Problem, ICD-9-V61.20, not a psychiatric illness requiring acute inpatient care or RTC care.

246.    This claim was knowingly false and fraudulent as PATIENT E did not have a psychiatric diagnosis requiring acute inpatient care or RTC inpatient treatment.

247.    Defendants submitted this false claim to TRICARE for these days of RTC inpatient care and were paid by TRICARE for daily facility charges and additional professional fees.

248.    PATIENT E was again admitted from February, 4, 2015, for an extended period of time to Kempsville's RTC on a bed to bed transfer from acute inpatient care diagnosed with Major Depressive Disorder, Recurrent, Severe, Without Psychosis, ICD-9- 296.33. The estimated discharge date was September 18, 2015. The exact discharge date is unknown as both Relators Sachs and Dierstein were no longer employed by UHS when the Patient was discharged.

249.    In fact, PATIENT E should not have been admitted to Kempsville's RTC as he suffered from Depressive Disorder, NOS, ICD-9-311.00; Stimulant Abuse, ICD-9-305.70; Conduct Disorder, Adolescent Type, ICD-9-312.82; Parent-Child Relational Problem, ICD-9-V61.20, not a psychiatric illness requiring inpatient RTC care.

250.     This claim was knowingly false and fraudulent as PATIENT E did not have a psychiatric diagnosis requiring RTC inpatient treatment.

251.     Defendants submitted this false claim to Virginia Medicaid for these days of residential treatment care and were paid by Virginia Medicaid for daily facility charges and additional professional fees.

252.     PATIENT H, an adolescent female was admitted to Kempsville's RTC in April 8, 2014, though August 1, 2014, falsely diagnosed with Major Depressive Disorder, Recurrent Episode, Severe, Without Psychosis, ICD-9-296.33.

253.     This claim was knowingly false and fraudulent as PATIENT H suffered from Depressive Disorder, NOS ICD-9-311.00 and related behavioral problems but did not have a psychiatric diagnosis requiring RTC inpatient treatment.

254.     Defendants submitted this false claim to TRICARE for these days of residential treatment care and were paid by TRICARE for daily facility charges and additional professional fees.

255.     PATIENT U, an adolescent female was admitted to Kempsville's RTC in October 16, 2014, though June 16, 2015, falsely diagnosed with Major Depressive Disorder, Recurrent Episode, Severe, Without Psychosis, ICD-9-296.33.

256.     These claims were knowingly false and fraudulent as PATIENT U should not have been admitted as she suffered from Depressive Disorder, ICD-9-299.00 and related behavioral problems but did not have a psychiatric diagnosis requiring acute inpatient treatment or RTC.

257.	Defendants submitted this false claim to MEDICAID for these days of acute inpatient care and RTC and were paid by MEDICAID for daily facility charges and additional professional fees.

## C. IMPLIED FALSE CERTIFICATION OF EMTALA COMPLIANCE

258.	In 1986, Congress enacted the Emergency Medical Treatment & Labor Act (EMTALA) to ensure public access to emergency services regardless of ability to pay. 42 U.S. Code § 1395dd; 42 C.F.R. § 489.24 (2002)

259.	Hospitals, including psychiatric hospitals, receiving payment under Medicaid must meet the requirements for participation in Medicare. 42 C.F.R. § 482.1(a)(5); 42 C.F.R. § 482.60(b)

260.	As a condition of participation in Medicare, hospitals must comply with EMTALA.

261.	Kempsville holds itself out to the public as a place that provides care for emergency psychiatric medical conditions on an urgent basis without requiring a previously scheduled appointment and is subject to the requirements of EMTALA.

262.	Kempsville violated EMTALA by refusing to evaluate, treat or stabilize patients that required emergency medical treatment because they lacked medical insurance or the ability to pay.

263.	Kempsville, through its agents and employees, by phone and in person, refused acute care for patients that required emergency inpatient care because they lacked insurance or other means of payment.

264.    For example, on January 1, 2014, Kempsville was contacted by Virginia Beach Community Services Board (VBCSB) seeking to admit PATIENT X, an adolescent male, in need of acute inpatient care.

265.    Kempsville refused to admit Patient X because he did not have insurance and could not otherwise pay for his care.

266.    On September 25, 2014, Kempsville was contacted by Prince Williams County Community Services Board (PWCSB) seeking to admit PATIENT Y, an adolescent male, in need of acute inpatient psychiatric care.

267.    Kempsville refused to admit Patient Y because he did not have insurance and could not otherwise pay for his care.

268.    On October 10, 2014, Kempsville was contacted by Henrico Crisis Intervention Team seeking to admit PATIENT Z, an adolescent female, in need of acute inpatient psychiatric care.

269.    Kempsville refused to admit Patient Z because she did not have insurance and could not otherwise pay for her care.

270.    On October 16, 2014, Kempsville was contacted by Middle Peninsula Community Services Board (MPCSB) seeking to admit PATIENT AA, an adolescent male, in need of acute inpatient psychiatric care.

271.    Kempsville refused to admit Patient AA because he did not have insurance and could not otherwise pay for his care.

272.     On November 17, 2014, Kempsville was contacted by Fairfax Hospital Emergency Department seeking to admit PATIENT BB, an adolescent male, in need of acute inpatient psychiatric care.

273.     Kempsville refused to admit Patient BB because he did not have insurance and could not otherwise pay for his care.

274.     On January 30, 2015, Kempsville was contacted by Hampton-Newport News Community Services Board (HNNCSB) seeking to admit PATIENT CC, an adolescent male, in need of acute inpatient psychiatric care.

275.     Kempsville refused to admit Patient CC because he did not have insurance and could not otherwise pay for his care.

276.     On February 17, 2015, Kempsville was contacted by Henrico County Community Services Board (HCSB) seeking to admit PATIENT DD, an adolescent male, in need of acute inpatient psychiatric care.

277.     Kempsville refused to admit Patient DD because he did not have insurance and could not otherwise pay for his care.

278.     On May 5, Kempsville was contacted by Western Tidewater Community Services Board (WTCSB) seeking to admit PATIENT EE, an adolescent female, in need of acute inpatient psychiatric care.

279.     Kempsville refused to admit Patient EE because she did not have insurance and could not otherwise pay for her care.

280.     On December 12, 2013, Kempsville was contacted by Eastern Shore Emergency Services seeking to admit PATIENT FF, an adolescent female, in need of acute inpatient psychiatric care.

281.     Kempsville refused to admit Patient FF because she did not have insurance and could not otherwise pay for her care.

282.     Defendants submitted claims to the United States for payment Under Medicaid and Tricare, but knowingly failed to disclose the Defendants' noncompliance with EMTALA.

283.     Defendants knew that the government requires EMTALA compliance as a condition of participation in Medicaid.

284.     Compliance with EMTALA was material to the Government's decision to pay MEDICAID and TRICARE claims submitted by the Defendants and the Government removes providers from Medicare and Medicaid participation for failure to comply with EMTALA.

**D. Doctors Discharge Records Fee**

285.     TRICARE and MEDICAID require that hospital discharge day management services, billed as CPT codes 99238 or 99239, must be performed by the treating physician or another physician within the same group.

286.     Code 99239 may only be used if the physician documentation supports that more than 30 minutes was required to discharge the patient. Code 99238 should be used if less than 30 minutes was required.

287.     All patient medical records must contain a discharge summary documenting outcome of the hospitalization, the disposition of the patient, and provisions for follow-up care.

288.     The discharge summary must be written or dictated by the treating physician or another physician who is knowledgeable about the patient's care and condition.

289.     Dr. Wendy Lexier paid cash, under the table, to Kempsville non-physician employees, including therapist Sarah Crawford and utilization review employees Candy Treat and Erica Beer, to complete the discharge summaries for her. These employees were not physicians and not qualified to create patient discharge summaries.

290.     Kempsville's Medical Director, Dr. Lenard Lexier, would also sign or dictate the discharge summary for patients under the care of his wife, Dr. Wendy Lexier, although he never saw these patients.

291.     Dr. Wendy Lexier billed MEDICAID, TRICARE as well as other government and private insurance payors for multiple patient discharges and signed the discharge summary without ever disclosing that she did not create or dictate the document.

292.     For example, Dr. Wendy Lexier submitted a bill to TRICARE for the discharge of PATIENT W on October, 24, 2014, and was paid by TRICARE for the discharge, but she did not prepare the discharge summary.

293.     Both Dr. Wendy Lexier and Defendants knew that nearly all of these patient discharge summaries submitted to MEDICAID and TRICARE under her name were false and fraudulent.

294.    Dr. Sachs reported Dr. Wendy Lexier's practice of paying Utilization Review employees to create discharge summaries to Cherie Gohr, Director of Human Resources at Kempsville, and others, but no one at UHS or Kempsville took any action to stop this practice.

## Count II. Virginia Fraud Against Taxpayers Act

295.    Relators hereby incorporate and reallege the previous paragraphs as if fully set forth herein.

296.    Defendants have repeatedly and continuously violated the Virginia Fraud Against Taxpayer Act ('VFATA").

297.    As described above and herein, Defendants, by and through their officers, agents and employees, knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to MEDICAID.

298.    As described above and herein, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

299.    As described above and herein, Defendants, by and through their officers, agents and employees conspired to commit a violation of subdivision 1 and 2 of Va. Code. Ann. §8.01-216.3 A.

300.    The Commonwealth of Virginia has been damages as a result of Defendants' violation of the Virginia Fraud Against Taxpayers Act.

301.    The Defendants are liable for damages for each of the actions alleged above and herein that violate the Virginia Fraud Against Taxpayer Act, Va. Code. Ann. §§8.01-216.1 through 8.01-216.19, as mandated by the statute.

302.    While Relators have alleged some of the specific patients and dates related to the false claims committed by the Defendants, Relators have knowledge of, but are unable to plead all of the details of hundreds of other claims because the necessary documentation and information is in the control and custody of Defendants.

### Count III.  Dr. Matthew Sachs's Virginia Wrongful Discharge Claim

303.    Relator Sachs hereby incorporates and realleges herein the other paragraphs in the Complaint as if fully set forth herein.

304.    UHS directed Dr. Sachs to participate in Tricare, Medicaid, and private insurance fraud as alleged herein.

305.    Defendants were demanding Sachs to commit acts that would violate both federal and state criminal statutes, and therefore would constitute a criminal act under both the United States and Virginia Code including but not limited to Va. Code §18.2-178.

306.    Defendants' orders to Dr. Sachs to actively participate in the fraud, in an environment of systemic civil and criminal fraud being committed on a daily basis for years by Defendants, rendered his continued employment intolerable to him and to any reasonable person and he was forced to resign.

307.    Accordingly, Defendants constructively discharged Sachs because of his refusal to engage in criminal acts.

308.     Sachs suffered damages from Defendants' actions that include, but are not limited, to the loss of his job, loss of income, mental anguish, and emotional and mental distress.

309.     Sachs suffered and continues to suffer from Defendants' actions that included willful, wanton and intentional conduct based on his refusal to engage in fraudulent activities.

310.     In addition to his compensatory damages, Dr. Sachs seeks **PUNITIVE DAMAGES** for the Defendants' willful, wanton, intentional and outrageous conduct.

**Count IV.   Laurie Dierstein's Virginia Wrongful Discharge Claim**

311.     Relator Dierstein hereby incorporates and realleges herein the other paragraphs in the Complaint as if fully set forth herein.

312.     UHS directed Dierstein to participate in Tricare, Medicaid, and private insurance fraud as alleged herein.

313.     Defendants were ordering Dierstein to commit acts that would violate both federal and state criminal statutes, and that therefore would constitute a criminal act under both the United States and Virginia Code including but not limited to Va. Code §18.2-178.

314.     Defendants' orders to Dierstein to actively participate in the fraud, in an environment of systemic civil and criminal fraud being committed on a daily basis for years by Defendants, rendered her continued employment intolerable to her and to any reasonable person and she was forced to resign.

315.    Accordingly, Defendants constructively discharged Dierstein because of her refusal to continue to engage in the defendant's fraudulent activities.

316.    Dierstein suffered damages from Defendants' actions that include, but are not limited, to the loss of her job, loss of income, mental anguish, and emotional and mental distress and all other damages permitted under the law.

317.    Dierstein suffered and continues to suffer from Defendants' actions that included willful, wanton and intentional conduct based on her refusal to engage in fraudulent activities.

318.    In addition to her compensatory damages, Dierstein seeks **PUNITIVE DAMAGES** for the Defendants' willful, wanton, intentional and outrageous conduct.

## Count V. Laurie Dierstein's Virginia Taxpayers
## Against Fraud Act Whistleblower Protection Claim

319.    Relator Dierstein hereby incorporates and realleges and incorporates herein the all other paragraphs of this complaint as if fully set forth herein.

320.    Relator Dierstein was discriminated against in the terms and conditions of her employment, was threatened, harassed, and ultimately discharged because she opposed the actions of Defendant as set forth in this Complaint that constituted practices referenced in Virginia Code section 8.01-216.3, and otherwise took actions that qualified her for relief under section 8.01-216.8 of the Virginia Code.

321.    The plaintiffs seek Punitive Damages for these intentional, willful, wonton, and outrageous acts by the Defendants.

322.    Therefore, Dierstein is entitled to the relief provided by Va. Code Ann. section 8.01-216.8.


## Count VI. Dr. Matthew Sachs's Virginia Taxpayers
## Against Fraud Act Whistleblower Protection Claim

323.    Relator Sachs hereby incorporates and realleges herein all the other paragraphs in this Complaint as if fully set forth herein.

324.    Relator Sachs was discriminated against in the terms and conditions of his employment, was threatened, harassed, and ultimately constructively discharged because he opposed the actions of Defendant as set forth in this Complaint that constituted practices referenced in Virginia Code section 8.01-216.3, and otherwise took actions that qualified him for relief under section 8.01-216.8 of the Virginia Code.

325.    The Plaintiffs seek Punitive Damages for these intentional, willful, wonton, and outrageous acts by the Defendants.

326.    Therefore, Sachs is entitled to the relief provided by Va. Code Ann. section 8.01-216.8.


**Wherefore,** with respect to FCA and VTAFA claims asserted in the Complaint, the Relators request that this Court grant the following relief:

(a)    A civil penalty of up to $10,000 for each such claim (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990), plus three times the amount of the damages sustained by the Government;

(b)    That Relators be awarded 30%, but in no event less than 15%, of the amount of any judgment rendered on those claims, or, in the event that the claims are settled, of the amount of the total settlement of those claims;

(c)    That the Relators be awarded all costs incurred in this action, including reasonable attorneys' fees; and

(d)    That the Relators receive all other relief, both at law and at equity, as this Court determines is appropriate.

**Wherefore,** with respect to Counts III, and IV, Relators request that the Court grant the following relief:

a)  That Relators be awarded all the relief to which they are entitled, including personal injury damages for emotional and mental distress, two times their back pay, interest on the back pay, front pay or reinstatement, attorneys' fees and litigation costs, **punitive damages** in the amounts that the jury determines; and

b)  Such other relief as the Court finds appropriate.

**Wherefore,** with respect to Counts V, IV, Relators request that the Court grant them all of the relief to which they are entitled under section 8.01-216.8 of the Virginia Taxpayers Against Fraud Act, including the following:

(a)    compensatory damages;

(b)     front pay, back pay, **punitive damages**, pre-judgment and post-judgment interest,

their attorneys' fees and costs expended in this action; and

(c)     Such further relief as the Court finds appropriate.

**A TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

Dated: 12/8/16

Jeffrey A. Breit, Esquire (VSB No. 18876)
Breit Drescher Imprevento, P.C.
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Telephone:  757.670.3888
Facsimile: 757.670.3895
E-mail: Jeffrey@breit.law